AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Keith Nicoletta | ) | Case No.  8:20MJ2027 JSS |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____May 2020 - October 2020____ in the county of _____Pasco_____ in the ____Middle____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1344, 1957 | bank fraud; illegal monetary transactions |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Brent Templeton, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/9/2020__

_____
*Judge's signature*

City and state: __Tampa, FL__

Julie S. Sneed, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, Brent Templeton, being duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2011. Prior to joining the FBI, I was a police officer with the United States Secret Service since 2004.

2.      My duties include investigating federal crimes, including conspiracy, bank fraud, and wire fraud. As an FBI agent, I am charged with enforcing the laws of the United States of America, and possess the authority to request, to obtain, and to execute orders of the United States Courts, including search warrants issued under federal authority. I have received extensive training in investigations, particularly in the area of fraud.

3.      This Affidavit supports an application for a criminal complaint and arrest warrant for KEITH NICOLETTA. As detailed throughout, in or about May 2020, NICOLETTA secured over $1.9 million in emergency funds from the Paycheck Protection Program ("PPP"), which is guaranteed by the Small Business Administration ("SBA"). In connection with NICOLETTA's loan application and his subsequent unauthorized use of the PPP funds, probable cause exists to believe that NICOLETTA violated multiple federal criminal laws, including 18 U.S.C. §§ 1344 (bank fraud) and 1957 (illegal monetary transactions). This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

*Overview of the Scheme*

4.    The primary focus of this investigation, which is ongoing, is KEITH

NICOLETTA, the owner of a purported scrap metal business known as West Coast

Cores, LLC ("WCC"). According to Florida corporate records, WCC is located at a

residential home in Dade City, Florida—meaning where NICOLETTA lives. As

detailed below, NICOLETTA secured over $1.9 million in emergency funds for

WCC from the PPP, as guaranteed by the SBA. NICOLETTA's SBA loan

application claimed that WCC had 69 employees with an Average Monthly Payroll

demand of $761,263—or, annualized, $9,135,156. That was false. Instead, Florida

wage records showed that, as of the date of the loan application, WCC had been

inactive for over a year. In fact, WCC had reported no wages for any employees for

2019 or 2020. Then, once the loan was secured, NICOLETTA did not use the PPP

funds for qualified expenses, such as WCC's purported payroll demand (which

doesn't exist). Instead, NICOLETTA laundered the money, transferring it between

various accounts at different financial institutions. During the same time period,

NICOLETTA purchased a 2020 Mercedes, a 2020 special edition pickup truck, and

wired approximately $537,000 to a property management company in south Florida.

5.    The facts of the investigation set forth below establish probable cause

that NICOLETTA engaged in bank fraud and money laundering in violation of 18

U.S.C. §§ 1344 and 1957.

2

*Background Regarding the PPP*

6.      In March 2020, the Coronavirus Aid, Relief, and Economic Security

Act, or the "CARES Act," was enacted to provide immediate assistance to

individuals, families, and organizations affected by the COVID-19 emergency.

Among its various provisions, the CARES Act authorized the SBA to guarantee loans

under the Paycheck Protection Program ("PPP"), and the full principal amount of the

loans could qualify for forgiveness.

7.      Borrowers were required to use PPP loan proceeds for enumerated

purposes, including payroll costs,[1] rent and utilities, and mortgage interest payments.

Knowing misuse of PPP funds subjects the borrower to additional liability, such as

charges for fraud.

8.      Under the PPP, the maximum loan amount is the lesser of $10 million

or an amount calculated using a payroll-based formula specified in the CARES Act.

The payroll-based formula principally considers the borrower's aggregate payroll costs

from the preceding twelve months for all domestic employees.[2] Once an average

---

[1] Payroll costs consist of compensation to employees (whose principal place of residence is
the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or
the equivalent (based on employer records of past tips or, in the absence of such records, a
reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family,
medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee
benefits consisting of group health care coverage, including insurance premiums, and retirement;
payment of state and local taxes assessed on compensation of employees; and for an independent
contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or
similar compensation.

[2] The payroll-based formula expressly excluded (i) any compensation of an employee whose
principal place of residence is outside of the United States; and (ii) the compensation of an
individual employee in excess of an annual salary of $100,000, prorated as necessary.

monthly payroll cost is established, the borrower multiplies that amount by 2.5 to

arrive at the total maximum PPP loan amount.

*The PPP Application Process: the SBA Form 2483*

9.     To apply for a PPP loan, potential borrowers electronically submit an

SBA Form 2483 with supporting payroll documentation to a financial institution that

administers the loan and serves as custodian of the funds. On the SBA Form 2483, an

authorized representative must make several certifications about his business

operations and related information. Those certifications include that: (i) the applicant

was in operation on February 15, 2020 and had employees for whom it paid salaries

and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC;

(ii) current economic uncertainty made the loan request necessary to support the

applicant's ongoing operations; and (iii) the PPP funds would be used to retain

workers and to maintain payroll or pay other qualifying expenses.

10.     Further, when submitting the SBA Form 2483, the authorized

representative certified that, should he knowingly use the PPP funds for unauthorized

purposes, the United States could hold him legally liable, including for charges of

fraud. The applicant must also certify the truth and accuracy of any information

provided on the SBA Form 2483 and in all supporting documents.[3] Such supporting

---

[3] Borrowers must submit such documentation as is necessary to establish eligibility for the loan amount. Examples of such documentation includes payroll tax filings (*e.g.*, IRS Forms 941), payroll processor records, IRS Forms 1099-MISC, bank records, or other records sufficient to demonstrate the qualifying payroll amount. As detailed above, the applicant, by submitting such documentation in support of the SBA Form 2483, affirms their veracity.

documents could include payroll tax filings with the Internal Revenue Service, such

as the Employer's Quarterly Federal Tax Return or the "IRS Form 941."

11.    Finally, the applicant must certify the following warning regarding false

statements and other criminal penalties:

> I understand that knowingly making a false statement to obtain a guaranteed
> loan from SBA is punishable under the law, including under 18 U.S.C. §§ 1001
> and 3571 by imprisonment of not more than five years and/or a fine of up to
> $250,000; under 15 U.S.C. § 645 by imprisonment of not more than two years
> and/or a fine of not more than $5,000; and, if submitted to a federally insured
> institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty
> years and/or a fine of not more than $1,000,000.

*Background regarding WCC*

12.    NICOLETTA secured the subject $1.9 million PPP loan, or caused it to

be secured, for a purported scrap metal company known as WCC.

13.    According to records from the Florida Department of State, in 2016,

NICOLETTA established WCC naming himself as its "manager." In 2017, V.N. (*i.e.*,

NICOLETTA's wife) was added as an additional manager. No other managers or

officers were listed on public corporate records.

14.    As of May 2020, the principal place of business for WCC was

NICOLETTA's personal residence in Dade City, Florida (the "Mansker Home

Residence").[4] On the subject PPP loan application (described in more detail later),

this residential address was listed as WCC's purported business address.

---

[4] In prior years, WCC was registered at a property on Green Road in Lakeland, Florida,
which NICOLETTA also owns. According to publicly available information, Green Road property
is a three-bedroom, two-bath residential home on an approximately one acre lot. Recent surveillance
of the Green Road property showed no industrial or commercial activity consistent with a salvage
operation that employs 69 employees as asserted on WCC's SBA Form 2483.

15.     WCC's supposed business purpose—a scrap metal company—is not compatible with a residential dwelling. According to publicly available information from the Pasco County Property Appraiser, NICOLETTA and his wife have owned the Mansker Home Residence since approximately August 2019. NICOLETTA also lists this address on his driver's license. Surveillance and other research related to the address did not support that WCC had such extensive operations to require 69 employees, as had been claimed on the SBA Form 2483. Further, general internet research did not yield any online presence for WCC.

16.     Florida wage records corroborate that WCC does not have the extensive operations listed on the SBA Form 2483. In Florida, employers must report quarterly wage and hour returns to certain state agencies. Records from the Florida Department of Economic Opportunity ("FDOE") reflected that WCC had no employees and was "inactive" as of March 31, 2019. This is consistent with additional WCC records from the Tampa Bay Regional Intelligence Center ("TBRIC"). According to TBRIC, WCC had no active wage-reporting account as of March 31, 2019. Further, even when WCC's account had previously been active, it failed to report any wages or earnings for any purported employees. And no wages were reported by WCC to the state of Florida in either 2019 or 2020.

*WCC's False and Fraudulent PPP Loan Application*

17.     On or about May 30, 2020, a false and fraudulent SBA Form 2483 seeking approximately $1,903,157 in PPP funds was electronically signed and submitted for WCC. The SBA's Office of Inspector General ("SBA-OIG") provided records and information about the PPP loan as detailed in the below paragraphs.

18.     On or about May 19, 2020, "keithnicoletta@mail.com" received an email from a loan processing company ("B.V."). Here, B.V.[5] processed and serviced WCC's SBA-guaranteed PPP loan, which was issued by C.B., a financial institution (as defined in 18 U.S.C. § 20) insured by the Federal Deposit Insurance Company. C.B. was the entity utilized to administer the loan and the entity with custody and control of the funds. To continue, the email's subject line read: *"Hi Keith, You haven't accepted your Paycheck Protection Program offer. Accept your approved offer now to access the government relief you need for your business."*

19.     Approximately an hour later, "keithnicoletta@mail.com" sent a response: *"Good Evening, I received my offer and im unable to sign my documents. When i login its stating that my application is still under review. please advised."*

20.     On May 30, 2020, the SBA Form 2483 was electronically signed and submitted using the email address "keithnicoletta@mail.com." On the SBA Form

---

[5] B.V. is a California fintech company that provides online business banking and financing solutions to small- and medium-sized businesses. According to its website, during the COVID-19 emergency, B.V. has provided thousands of PPP relief loans to small businesses and other customers. Through B.V., over $4.5 billion in PPP funds were delivered to at least 155,000 customers. See https://www.********.com/paycheck-protection-program/ (last accessed Sept. 21, 2020).

2483, NICOLETTA's residential address (*i.e.*, the Mansker Home Residence) served as WCC's business address.[6] NICOLETTA was identified as WCC's "authorized representative" and sole owner. As the purposes for the loan, the form cited "Payroll," "Lease/Mortgage Interest," and "Utilities."

21.     On the SBA Form 2483, it was falsely claimed that WCC had 69 employees with an Average Monthly Payroll demand of $761,263. Using the payroll-based calculator, the requested PPP funds totaled $1,903,157 (or 2.5 times his Average Monthly Payroll).

22.     Then, the SBA Form 2483 reflected the electronic initials "K.N." (meaning "Keith Nicoletta") beside each and every required certification for the PPP loan, including those set forth verbatim below:

a.  "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

b.  "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

---

[6] NICOLETTA's purported residential address was listed as a property on Green Road in Lakeland, Florida, which he also owns

*False IRS Forms 941 Used to Support the PPP Loan Application*

23.    As part of the PPP loan application, purported payroll tax records for

WCC were provided as supporting documentation for the alleged Average Monthly

Payroll of $761,263. Specifically, the applicant uploaded four IRS Forms 941, or the

Employer's Quarterly Federal Tax Return, for WCC for Q1–Q4 of 2019. The

purported IRS Forms 941 contradict WCC's mandatory wage reporting for the state

of Florida. As detailed above, records from the FDOE and TBRIC showed that WCC

had no employees and was "inactive" as of March 31, 2019. No wages at all were

reported for WCC for 2019 or 2020, which contradicts the claimed average payroll

demand of $761,263—or, annualized, $9,135,156.

24.    The IRS Forms 941 themselves also reflected badges of fraud: the

information on the forms were identical for each and every quarter. All of the IRS

Forms 941 for 2019 listed the same number of employees (*i.e.*, Line 1 – 69

employees), with the same exact figures for "Wages, tips, and other compensation"

(*i.e.*, Line 2 – $2,283,790) and "Federal income tax withheld" (*i.e.*, Line 3 –

$479,595.90). The electronic submission of false IRS Forms 941 to support the PPP

loan application establishes probable cause for multiple federal crimes, including bank

fraud in violation of 18 U.S.C. § 1344.

*Additional Representations in PPP Loan Promissory Note*

25.     Along with the SBA Form 2483, an electronic PPP Loan Promissory Note ("Note") with C.B. was signed on May 30, 2020. In the section titled "Use of Proceeds," the Note advised that the "Borrower"—meaning NICOLETTA—"shall use the proceeds of this loan only for eligible expenses under the terms of the PPP." It further warned that "[t]he Borrower shall use the funds received under this Note for business purposes only and *not* for personal, family or household purposes." (Emphasis added.)

26.     Additionally, in the Note, the truth and accuracy of the information provided was recertified. The certification stated specifically as follows:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

*Transfers and Improper Use of PPP Funds*

27.     On or about June 2, 2020, C.B. electronically disbursed $1,903,157 in PPP funds to WCC's bank account (-3127) at Credit Union #1. Prior to this deposit, the balance of WCC's account (the "CU-1 Account -3127") was approximately $11.74. Some information regarding CU-1 Account -3127's history is now warranted. Records for CU-1 Account -3127 show no history of payroll activity for WCC

10

consistent with the representations on the SBA Form 2483. A detailed review of banks records showed that, on February 1, 2020, CU-1 Account -3127 had a starting monthly balance of $446.24. The only activity in the account for the entire month of February was a $350.00 check written to an individual named F.R. After that check was drawn, the CU-1 Account -3127 was left with a balance of only approximately $96.24. This would remain the starting balance for March 2020, which is when the CARES Act was passed. On or about March 12, 2020, Credit Union #1 assessed a fee for insufficient funds in CU-1 Account -3127. In April and May 2020, the balances for CU-1 Account -3127 never exceeded approximately $4,312.94. Further, records from 2019 for CU-1 Account -3127 do not reflect routine payments to any recognizable payroll company or consistent payments to any meaningful number of individuals who could possibly be WCC employees. Instead, WCC's expenses mainly appear to relate to third-party companies, including in the salvage industry.

28.    Further, once the PPP funds were deposited, NICOLETTA did not appear to use the money to fund payroll or to pay wages to individuals directly. Instead, NICOLETTA engaged in a series of intra-bank transfers between his personal and business banks accounts at Credit Union #1. Notably, on June 2, 2020 (*i.e.*, the day the PPP funds were disbursed), NICOLETTA transferred $1,000,000 from CU-1 Account -3127 into his personal savings account (-1379). He then moved $999,000 in two separate transfers into a WCC business savings account (-3020) also held at Credit Union #1. On June 4, 2020, NICOLETTA withdrew $50,000 in cash

11

from the business savings account (-3020). The next day (*i.e.*, June 5), NICOLETTA drew a cashier's check from this account (-3020) for approximately $1,846,000. NICOLETTA then deposited the cashier's check into his personal checking account ("CU-1 Personal Account -1405") that same day.

29.     Almost immediately after the PPP deposit, NICOLETTA began transferring the money into other Credit Union #1 personal and business accounts that he controlled, including a personal account (-1405) held in his own name ("CU-1 Personal Account -1405"). Also, on June 4, 2020, NICOLETTA withdrew $50,000 cash from a business savings account (-3020) at Credit Union #1 held in WCC's name.

30.     That month, NICOLETTA established a new personal bank account at Credit Union #2 (the "CU-2 Account -9858"). On June 8, 2020, NICOLETTA transferred $1,741,000 from his CU-1 Personal Account -1405 to CU-2 Account -9858. This transfer and others described and pictured below support probable cause for money laundering in violation of 18 U.S.C. § 1957.

31.     At Credit Union #2, NICOLETTA opened at least three additional bank accounts for entities that were newly registered with the Florida Department of State. The entities and their respective accounts are as follows:

      a.  KVNE Scrap LLC, incorporated June 9, 2020;
          CU-2 Account Ending in -9023.

      b.  Hollywood Nails 1, LLC, incorporated June 17, 2020;
          CU-2 Account Ending in -1975.

12

      c. Elegant Nails 2, LLC, incorporated June 17, 2020;
        CU-2 Account Ending in -2236.

None of these entities appears to have existed as of the date of NICOLETTA's PPP

loan application, nor were they mentioned on the SBA Form 2483.

    32.    As depicted in the following diagram, nearly all of the PPP loan

proceeds—which had supposedly been secured for WCC's "Payroll,"

"Lease/Mortgage Interest," and "Utilities"—were transferred into other personal or

business accounts within NICOLETTA's control. These dispositions fall well outside

of the SBA's enumerated, authorized uses for PPP funds, which supports probable

cause for violations of 18 U.S.C. §§ 1344 and 1957:



    33.    As depicted above, some of the PPP funds were transferred to third

parties, including, for example, (i) a $23,500 written to a title company on June 16,

2020, and (ii) $537,000 in two wires to a property management company on June 10 and 17, 2020. Additionally, there were numerous large cash withdrawals of the PPP funds. NICOLETTA also purchased a 2020 Mercedes valued at $106,849 from a dealership in Lakeland, Florida, writing a check in the amount of $55,000 towards the purchase using PPP funds. And, during the same time period, NICOLETTA purchased a 2020 Ford F-250 pickup truck, platinum edition,[7] which has an MSRP value of at least $66,000. The purchase was initially discovered by surveillance teams, which observed NICOLETTA leaving the Mansker Home Residence in this special edition pickup truck on his way to play golf at a nearby country club. The actual vehicle is pictured below:



34.     NICOLETTA's misuse of PPP funds further supports violations of 18 U.S.C. §§ 1344 and 1957.

---

[7] According to Florida Driver and Vehicle Information Database, NICOLETTA purchased this special edition pickup truck on August 24, 2020. On the truck's title paperwork, NICOLETTA listed his residential address as the Mansker Home Residence, *i.e.*, the same address that he claimed was WCC's purported business address on the SBA Form 2483.

## CONCLUSION

Based on the foregoing fact, probable cause exists to believe that, from at least

in or around May 2020, through and including September 2020, KEITH

NICOLETTA violated 18 U.S.C. §§ 1344 (bank fraud) and 1957 (illegal monetary

transactions).

FURTHER AFFIANT SAYETH NAUGHT.

_____
Brent Templeton, Special Agent, FBI

Sworn to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 and
41(d)(3) via telephone this __9__ day of
October 2020.

JULIE S. SNEED
United States Magistrate Judge

15